### THE INNERTON.

### CHAPMAN et al. v. CARGILL, Inc.

### No. 10762.

Circuit Court of Appeals, Fifth Circuit.

April 5, 1944.

H. C. Hughes, of Galveston, Tex., for appellants.

George C. Sprague, of New York City, and W. E. Cranford, of Galveston, Tex., for appellee.

Before HUTCHESON, HOLMES, and LEE, Circuit Judges.

HOLMES, Circuit Judge.

This is a libel in personam in admiralty brought by Cargill, Inc., to recover damages from appellants, owners of the Steamship Innerton, a British vessel, for breach of a

charter party. A decree was entered for the libelant awarding damages in the sum of $66,452.96. This appeal challenges the correctness of the decree, both as to liability and as to damages.

The charter party provided that the Innerton should proceed to a gulf port (Houston, Texas), there load a complete cargo of grain or soy beans or both, and proceed therewith to one or two safe ports in the United Kingdom or one or two ports out of Antwerp, Rotterdam, Amsterdam, or Queenstown, the port of destination to be designated by the charterer on signing the bills of lading. Acting pursuant to the charter party, the Innerton proceeded to the specified dock in Houston where the cargo was to be loaded, arriving on September 19, 1939, approximately two weeks after the declaration of war between Great Britain and Germany.

On September 6 and 8, 1939, the English Board of Trade, acting under statutory emergency powers, promulgated an order applicable to the Innerton forbidding it from proceeding to sea from any port after September 13, 1939, except under authority of a license from the Ship Licensing Committee of the Board of Trade. Pursuant to this order, appellants applied for a license covering the voyage specified in the charter party. The Licensing Committee refused to grant the license, but advised that, if an application were made for a voyage to the United Kingdom only, it would be favorably considered. This response was communicated orally to the charterer on September 19th, and a copy of the written refusal was delivered to it two days later. On the latter date the charterer demanded that another application be made for a license for the fulfilment of the charter party in accordance with its terms and conditions without alteration. This immediately was done, and on September 23rd the Licensing Committee answered that it was unable to alter its previous decision.

When advised of the second refusal, the charterer demanded that the appellants tender the Innerton for the loading of cargo. Appellants declined to do this, stating that it would be useless to load the cargo since the fulfilment of the charter party had been frustrated by operation of law. Thereupon appellants entered into another charter party for the carriage of

cotton to the United Kingdom, from which they realized a much greater financial return. This suit then was instituted against them for breach of the charter party.

█ It is clear that appellants' refusal to present the Innerton for loading upon the demand of the charterer constituted a breach of the charter party. Under the terms of that agreement, the port of destination was to be selected by the charterer from the optional ports designated in the charter party when the bills of lading were executed after the vessel had been loaded. The action taken by the Ship Licensing Committee made it reasonably certain that a license would be issued if any port of the United Kingdom was named as the port of destination. Such ports were within the option available to the charterers. For this reason, the charter party was not proved to be impossible of performance by reason of frustration or otherwise at the time demand was made that the Innerton be presented for loading. It was appellants' contractual duty to present the vessel for loading, and their failure so to do breached the charter party and rendered them liable in damages.

The decree below awarded damages in the sum of $66,452.96. The measure of damages applied was the difference between the net value of the intended shipment in Houston, plus all charges incident to transportation, and the selling price of the cargo in Antwerp calculated upon the assumption that the vessel would have reached Antwerp on November 17, 1939, and that the cargo would have been sold in parcels during the ensuing month. Under the facts here presented, this was not a proper measure of damages.

█ Appellants did not breach their charter party by any refusal to transport the cargo to Antwerp. The unequivocal manner in which the Licensing Committee on successive occasions denied a license for performance of the charter party as written plainly indicated that no permission would be given for the carriage of the grain to any continental port. No facts were present which, as in the decision relied upon,[1] might have induced the Committee to change its ruling. In so far as carriage under the charter party including continental ports as optional ports of destination was concerned, the appellants took

---

[1] Bakubhai & Ambalal, Ltd., v. South Aust. Farmers' Co-op Union, Ltd., 69 Lloyd's List Law Reports, 138.

every reasonable step to secure the license.[2] Rather, the breach resulted from appellants' failure to discharge the contract duty upon them with respect to loading at a time when the charter party could have been performed upon the subsequent designation of a United Kingdom destination. Otherwise stated, appellants' acts which constituted a breach of the charter party did not prevent the charterer from realizing profits upon delivery in Antwerp, but only from realizing such profits as may have been available upon·delivery to some optional port of the United Kingdom. Antwerp profits were precluded by operation of law, not by reason of any failure of appellants in the performance of any duty imposed upon them by the charter party.

■ The evidence discloses without contradiction that, subsequent to the breach, the charterer was unable to make another charter for grain carriage from Houston to the range of destination fixed by the charter party; it is not clear whether any attempt was made to obtain a charter for grain carriage from Houston to the United Kingdom. The record is also wholly without proof as to damages under a secondary measure, namely, the difference between the market value of the merchandise at the port of destination and the market value at the port of shipment, less the transportation charges.[3] Not only was no proof submitted as to prevailing grain prices at ports of the United Kingdom, but the evidence strongly indicates that none of such ports were open markets for grain. Moreover, it appears that the grain ultimately was sold on the domestic market on a rising price level, so that no loss could be attributable to any delay in marketing the grain occasioned by the breach.

■ A final alternative measure of damages was that suggested by the charterer late in the trial of the case, i. e., the damages inherent in the loss of the charter party contract. In some aspects, the value of the charter party and the damages re-sulting from its loss already have been considered, for that value is inextricably bound up in the loss-of-profits theory of damages and in the measure of damages arising from a comparison of the cost of the best alternative course of procedure. It may be, however, that the charter-party contract had a value as a commodity for barter or sale. Under the terms of that instrument, the charterer had the privilege of transferring the charter party to others. Be this as it may, no proof was submitted in this case that would support a decree under any measure of damages applicable to the facts presented. Appellee should be afforded an opportunity upon remand to make proper proof of his damages if any actually have been sustained.

The judgment is affirmed in so far as it holds appellant liable for damages for breach of the charter party, but reversed as to the amount of damages awarded; and the cause is remanded to the district court for further proceedings not inconsistent with this opinion.

HUTCHESON, Circuit Judge (concurring).

I am not as clear as my associates are that the proof establishes that if appellant had tendered its ship for loading, it could not have gotten leave to sail to Antwerp. I am satisfied, though, that whether it could or could not have gotten such leave, appellee was not entitled to the damages awarded. The appellee stated on the record that it was not claiming damages for loss in the price of wheat, that the damage was the loss of a valuable charter party, the loss in freight rates,[1] and yet it sought and obtained a recovery based on the loss on the Antwerp market. Without, therefore, agreeing with all that is said in the opinion, I concur in its conclusion that the judgment should be reversed and that upon remand appellee should be awarded an opportunity to prove his damages in the loss in freight rates rather than the loss in the price of wheat.

[1] See Record, pp. 225, 226.

[2] Appellants' duty was to take every reasonable step to secure a license for performance of the charter party to ports designated by the charterer. Anglo-Russian Merchant Traders, Ltd., v. John Batt & Co., 2 K.B. 679; Bakubhai & Ambalal, Ltd., v. South Aust. Farmers' Co-op Union, Ltd., supra.

[3] Vogeman v. Raeburn, 2 Cir., 180 F. 97; The Manhattan, 4 Cir., 284 F. 310; Putnam Lumber Co. v. Ashcraft-Wilkinson Co., 5 Cir., 96 F.2d 233; Poor on Charter Parties, 2nd Ed., page 178.